## MATTHEWS v. McSTEA.

1. It was not until the 16th of August, 1861, that all commercial intercourse between the States designated as in rebellion and the inhabitants thereof, with certain exceptions, and the citizens of other States and other parts of the United States, became unlawful.
2. A partnership between a resident of New York and other parties, residents of Louisiana, was not dissolved by the late civil war as early as April 23, 1861; and all the members of the firm are bound by its acceptance of a bill of exchange bearing date and accepted on that day, and payable one year thereafter.

ERROR to the Court of Common Pleas for the City and County of New York.

The original cause of action was (*inter alia*) an acceptance

of a bill of exchange by the firm of Brander, Chambliss, & Co., of New Orleans, dated April 23, 1861, payable in one year to the order of McStea, and accepted on the day of its date by the firm, whereof Matthews, it was alleged, was then a member. The principal defence, and the only one which presents a Federal question, was, that, at the time when the acceptance was made, the defendant, Matthews, was a resident of the State of New York; that the other members of the firm (also made defendants in the suit, but not served with process) were residents of Louisiana; and that, before the acceptance, the copartnership was dissolved by the war of the rebellion. This defence was not sustained in the Common Pleas, and the judgment of that court was affirmed by the Court of Appeals.

Matthews sued out this writ of error.

*Mr. John Sherwood* and *Mr. William M. Evarts* for the plaintiff in error.

The war began in Louisiana, April 19, 1861. *The Protector*, 12 Wall. 700. The proclamation of April 19, 1861, declaring the blockade, was a notice of prohibition of commercial intercourse. The proclamations of April 17 and 19, and the act of Congress of July 13, 1861, do not contain any permission to trade, or any inference that such trade was permitted. Commercial intercourse during war being unlawful, it cannot be implied from the proclamations of the Executive and the acts of Congress. *The Prize Cases*, 2 Black, 635 ; *United States* v. *Lane*, 8 Wall. 185 ; *Cappell* v. *Hall*, 7 id. 542.

The copartnership of Brander, Chambliss, & Co., was dissolved, even if a limited intercourse was permitted. The courts of Louisiana were closed. The legality of commerce and the mutual use of courts of justice must be inseparable. *Griswold* v. *Waddington*, 16 Johns. 468.

*Mr. J. Hubley Ashton, contra.*

There was no dissolution of partnership prior to the President's proclamation of Aug. 16, 1861, issued in pursuance of the act of July 13, 1861.

No proclamation of the President, previous to the assembling of Congress in 1861, professed to interfere with the commercial intercourse between the inhabitants of the loyal and of the insurgent States, which did not involve a breach of the blockade

of the ports within certain States; and such intercourse continued long after April 23, 1861.

The fifth section of the act of July 13, 1861, shows that, in the opinion of Congress, positive legislation was necessary in order to render unlawful all commercial intercourse between the insurgent and the loyal States.

MR. JUSTICE STRONG delivered the opinion of the court.

The single question which this record presents for our consideration is, whether a partnership, where one member of the firm resided in New York and the others in Louisiana, was dissolved by the war of the rebellion prior to April 23, 1861.

That the civil war had an existence commencing before that date must be accepted as an established fact. This was fully determined in *The Prize Cases*, 2 Black, 635; and it is no longer open to denial. The President's proclamation of April 19, 1861, declaring that he had deemed it advisable to set on foot a blockade of the ports within the States of South Carolina, Georgia, Alabama, Florida, Mississippi, Louisiana, and Texas, was a recognition of a war waged, and conclusive evidence that a state of war existed between the people inhabiting those States and the United States.

It must also be conceded, as a general rule, to be one of the immediate consequences of a declaration of war and the effect of a state of war, even when not declared, that all commercial intercourse and dealing between the subjects or adherents of the contending powers is unlawful, and is interdicted. The reasons for this rule are obvious. They are, that, in a state of war, all the members of each belligerent are respectively enemies of all the members of the other belligerent; and, were commercial intercourse allowed, it would tend to strengthen the enemy, and afford facilities for conveying intelligence, and even for traitorous correspondence. Hence it has become an established doctrine, that war puts an end to all commercial dealing between the citizens or subjects of the nations or powers at war, and " places every individual of the respective governments, as well as the governments themselves, in a state of hostility: " and it dissolves commercial partnerships existing between the subjects or citizens of the two contending parties prior to the war;

for their continued existence would involve community of interest and mutual dealing between enemies.

Still further, it is undeniable that civil war brings with it all the consequences in this regard which attend upon and follow a state of foreign war. Certainly this is so when civil war is sectional. Equally with foreign war, it renders commercial intercourse unlawful between the contending parties, and it dissolves commercial partnerships.

But, while all this is true as a general rule, it is not without exceptions. A state of war may exist, and yet commercial intercourse be lawful. They are not necessarily inconsistent with each other. Trading with a public enemy may be authorized by the sovereign, and even, to a limited extent, by a military commander. Such permissions or licenses are partial suspensions of the laws of war, but not of the war itself. In modern times, they are very common. Bynkershoek, in his Quæst. Jur. Pub., lib. 1, c. 3, while asserting as a universal principle of law that an immediate consequence of the commencement of war is the interdiction of all commercial intercourse between the subjects of the States at war, remarks, " The utility, however, of merchants, and the mutual wants of nations, have almost got the better of the laws of war as to commerce. Hence it is alternatively permitted and forbidden in time of war, as princes think it most for the interests of their subjects. A commercial nation is anxious to trade, and accommodates the laws of war to the greater or lesser want that it may be in of the goods of others. Thus sometimes a mutual commerce is permitted generally; sometimes as to certain merchandise only, while others are prohibited; and sometimes it is prohibited altogether." Halleck, in his " Treatise on the Laws of War," p. 676 *et seq.*, discusses this subject at considerable length, and remarks, " That branch of the government to which, from the form of its constitution, the power of declaring or making war is intrusted, has an undoubted right to regulate and modify, in its discretion, the hostilities which it sanctions. . . . In England, licenses are granted directly by the crown, or by some subordinate officer to whom the authority of the crown has been delegated, either by special instructions, or under an act of Parliament. In the United States, as a general rule,

licenses are issued under the authority of an act of Congress; but in special cases, and for purposes immediately connected with the prosecution of the war, they may be granted by the authority of the President, as commander-in-chief of the military and naval forces of the United States."

It being, then, settled that a war may exist, and yet that trading with the enemy, or commercial intercourse, may be allowable, we are brought to inquire whether such intercourse was allowed between the loyal citizens of the United States and the citizens of Louisiana until the 23d of April, 1861, when the acceptance was made upon which this suit was brought. And, in determining this, the character of the war and the manner in which it was commenced ought not to be overlooked. No declaration of war was ever made. The President recognized its existence by proclaiming a blockade on the 19th of April; and it then became his duty as well as his right to direct how it should be carried on. In the exercise of this right, he was at liberty to allow or license intercourse; and his proclamations, if they did not license it expressly, did, in our opinion, license it by very cogent implications. It is impossible to read them without a conviction that no interdiction of commercial intercourse, except through the ports of the designated States, was intended. The first was that of April 15, 1861. The forts and property of the United States had, prior to that day, been forcibly seized by armed forces. Hostilities had commenced; and, in the light of subsequent events, it must be considered that a state of war then existed. Yet the proclamation, while calling for the militia of the several States, and stating what would probably be the first service assigned to them, expressly declared, that, " in every event, the utmost care would be observed, consistently with the repossession of the forts, places, and property which had been seized from the Union, to avoid any devastation, destruction of or interference with property, or any disturbance of peaceful citizens in any part of the country." Manifestly, this declaration was not a mere military order. It did not contemplate the treatment of the inhabitants of the States in which the unlawful combinations mentioned in the proclamation existed as public enemies. It announced a different mode of treatment, — the treatment due

to friends. It is to be observed that the proclamation of April 15, 1861, was not a distinct recognition of an existing state of war. The President had power to recognize it, *The Prize Cases, supra;* but he did not prior to his second proclamation, that of April 19, in which he announced the blockade. Even then, the war was only inferentially recognized; and the measures proposed were avowed to be " with a view to . . . the protection of the public peace and the lives and property of quiet and orderly citizens pursuing their lawful occupations, until Congress shall have assembled." The reference here was plainly to citizens of the insurrectionary States; and the purpose avowed appears to be inconsistent with their being regarded as public enemies, and consequently debarred from intercourse with the inhabitants of States not in insurrection. The only interference with the business relations of citizens in all parts of the country, contemplated by the proclamation, seems to have been such as the blockade might cause. And that it was understood to be an assent by the Executive to continued business intercourse may be inferred from the subsequent action of the government (of which we may take judicial notice) in continuing the mail service in Louisiana and the other insurrectionary States long after the blockade was declared. If it was not such an assent or permission, it was well fitted to deceive the public. But in a civil more than in a foreign war, or a war declared, it is important that unequivocal notice should be given of the illegality of traffic or commercial intercourse; for, in a civil war, only the government can know when the insurrection has assumed the character of war.

If, however, the proclamations, considered by themselves, leave it doubtful whether they were intended to be permissive of commercial intercourse with the inhabitants of the insurrectionary States, so far as such intercourse did not interfere with the blockade, the subsequent act of Congress passed on the thirteenth day of July, 1861, ought to put doubt at rest.

The act was manifestly passed in view of the state of the country then existing, and in view of the proclamation the President had issued. It enacts, that in a case therein described, a case that then existed, " it may and shall be lawful for the President, by proclamation, to declare that the inhab-

itants of such State, or any section or part thereof where such insurrection exists, are in a state of insurrection against the United States; and *thereupon* all commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United States, shall cease and be unlawful so long as such condition of hostility shall continue." Under authority of this act, the President did issue such a proclamation on the 16th of August, 1861; and it stated that all commercial intercourse between the States designated as in insurrection and the inhabitants thereof, with certain exceptions, and the citizens of other States and other parts of the United States, was unlawful. Both the act and the proclamation exhibit a clear implication, that before the first was enacted, and the second was issued, commercial intercourse was not unlawful; that it had been permitted. What need of declaring it should cease, if it had ceased, or had been unlawful before? The enactment that it should not be permitted after a day then in the future must be considered an implied affirmation that up to that day it was lawful; and certainly Congress had the power to relax any of the ordinary rules of war.

We think, therefore, the Court of Appeals was right in holding that the partnership of Brander, Chambliss, & Co., had not been dissolved by the war when the acceptance upon which the plaintiff in error is sued was made.

*The judgment is affirmed.*