KARL KAHNWEILER v. JAMES ANDERSON.

*Bill of Exchange—Equitable Assignment—Parties—Practice—Negligence—Demand—Statute of Limitations.*

1. The intention to assign a fund in the hands of another, founded upon sufficient consideration and expressed by a bill of exchange, operates as an equitable assignment to the payee.

2. A, living in this State, had a certain fund to his credit in the hands of B in New York, and on July 30th, 1861, gave to C for sufficient consideration, a bill of exchange upon B for the whole amount of the fund ; the bill of exchange was immediately endorsed by C to D (residing in New York) and mailed to his address, civil war between the States being then raging ; the bill of exchange was never received by D nor had he notice of it until 1866, when he was informed of the remittance by C, who had however then forgotten of whom he had purchased the bill ; in 1865, the fund in the hands of B was collected of him by A ; in 1876, C ascertained, by finding a memorandum upon an old check book, that the bill of exchange had been purchased from A ; D thereupon, in 1876, made a demand upon A for payment to him of the fund which A declined to pay and D thereupon instituted suit against A for the same ; *Held*, that D was entitled to recover.

3. In such case, the action is properly brought in the name of D.

4. In such case, even if it was negligence upon the part of C to have forwarded the bill of exchange by mail, A was contributory to it, and cannot take advantage of it.

5. In such case, D (independent of the Act suspending the statute of limitations) is *prima facie* excused from making a demand on A for payment until the restoration of peace ; and is also excused under the circumstances from making a demand on B.

6. In such case, the statute of limitations did not begin to run against D until after the demand made by him upon A in 1876, for the amount of the fund.

7. When the statute of limitations is relied upon as a defence, it can be taken advantage of only by answer.

(*Green* v. *N. C. R. R. Co.*, 73 N. C. 524, cited and approved.)

(SMITH, C. J. and RODMAN J. *Dissenting.*)

CIVIL ACTION, tried at June Special Term, 1877, of NEW HANOVER Superior·Court, before *Seymour, J.*

The demurrer of defendant admits the facts as alleged in the complaint, and they are these:—

On the 30th of July, 1861, David, Daniel and Jacob Kahnweiler were merchants and co-partners in business in the City of Wilmington, North Carolina, under the name of Kahnweiler & Brothers, and on that day were indebted to the plaintiff, Karl Kahnweiler, in the sum of $1900, the said Karl being then a citizen and resident of the City and State of New York. On the said day the defendant, Anderson, applied to Daniel Kahnweiler to know if he desired to purchase exchange on New York, at the same time informing him, that he had to the credit of Anderson & Savage, in the hands of Montel & Bartow in the City of New York, the sum of $1804,57. The said Anderson & Savage had been late co-partners in business in the City of Wilmington. Daniel agreed to take the said exchange at the rate of five per cent. preminm, and accordingly paid Anderson the sum of $1804,57, and the further sum of $90,23 being five per cent. premium on the same, and took from the said Anderson a bill of exchange drawn in the name of Anderson & Savage, and directed to the said Montel & Bartow, and payable to the order of Kahnweiler & Brothers for the sum of $1804,57 at sight. On the same day the said Daniel in the name of Kahnweiler & Brothers endorsed the same to be paid to the said Karl Kahnweiler or his order, and the said bill of exchange was on the same day enclosed in a letter and deposited in the post-office in Wilmington, addressed to the said Karl in the City of New York.

In the month of August, 1865, said Daniel being then in New York, the plaintiff Karl applied to him for payment of the debt due him by Kahnweiler & Brothers, and the said Daniel informed him that Kahnweiler & Brothers had

KAHNWEILER v. ANDERSON.

paid the debt by a draft on some house in New York, which had been sent in 1861, but whose draft it was, or on whom drawn, the said Daniel could not then recollect. The said Daniel was then for the first time informed that the draft had never been received, and that the debt remained unpaid.

In the month of January, 1865, on account of the war then prevailing between the North and South, the said Kahnweiler & Brothers had removed all the books of their firm in Wilmington, to Charlotte for greater security, and some were sent from Charlotte to New York in 1865, after the close of the war. The books were removed to Wilmington in the year 1866 or '67. During those years the said Daniel made diligent search for some evidence of the said bill of exchange, but without success. The only memorandum of said bill was made on the margin (commonly called the "stub") of a check-book, and it was not until the month of March, 1876, that a memorandum of the check which was given in payment of the draft drawn by Anderson & Savage on Montel & Bartow, was found by the said Daniel. Then for the first time was discovered on the margin of the check-book, a memorandum of the check given in payment for the bill of exchange. This check was duly paid on the same day it was given to Anderson & Savage, but the bill of exchange drawn by Anderson & Savage on Montel & Bartow, has not been paid by the said drawer or the said Montel & Bartow.

In the month of March, 1866, James Anderson directed Montel & Bartow to pay over to him the said sum of $1804,-57 and interest thereon, which sum was accordingly on the 12th of March, 1866, so paid over to James Anderson. On the discovery of the memorandum in the check-book, the said Daniel recollected the fact of obtaining the bill from James Anderson, and on the 18th of May, 1876, as agent of the plaintiff, demanded of the defendant the said sum of

money, tendering at the same time a good and sufficient bond of indemnity. &c,

It was contended by the plaintiff that the bill of exchange so made payable to the order of Kahnweiler & Brothers, and by them endorsed to the plaintiff, although not presented to or accepted by the drawees, Montel & Bartow, constituted an equitable lien upon the fund of the drawer in the hands of the drawees, by virtue of which the plaintiff can follow the fund, at least in the hands of the drawer himself.

On the hearing His Honor being of opinion with plaintiff gave judgment that the demurrer be overruled, and defendant have leave to answer over. He also held that the statute of limitations did not bar the action. From which ruling the defendant appealed.

*Mr. D. L. Russell,* for plaintiff, cited Par. on Bills 461; Danl. Neg. Instr. §§ 67, 1073 *et seq;* Stat. Lim. or lapse of time to avail as defence must be by answer. *Privett* v. *Galloway,* 75 N. C. 233; *Green* v. *N. C. R. R. Co.,* 73 N. C. 524; no bar where relief is based on secret fraud. Angell on Lim. ch. 18; Adams Eq. 176; 11 Wallace 442; nor where equity has jurisdiction. 4 Hawks, 412; 1 D. & B. Eq. 325; 3 Jones Eq. 102. Action did not accrue till discovery of fraud which gives to plaintiff a new right. 2 Dan. Ch. Prac. 762. Bill drawn for whole amount is an equitable assignment. Danl. Neg. Instr. § 451; 5 Wheat. 277; 6 Gratt. 364; 20 Pick. 15.

*Messrs. A. T. & J. London,* for defendant, cited 46 E. C. L. R. 663; Order expressed on its face to be payable out of a particular fund upon notice to drawee is an equitable assignment, but such an order is a draft and not a *bill of exchange. Row* v. *Dawson,* 1 Ves. 331; Story Eq. Juris. 1044; Morse on Banks, &c., 464; 8 Comstock 251; 14 Wall. 69. Defendant discharged of liability by laches of holder. 2

KAHNWEILER *v.* ANDERSON.

Danl. Neg. Instr. § 1173; 2 Par. on Bill, 260; 2 Jones Eq. 31, 93 U. S. R. 593. Lapse of time in equity may be availed of by demurrer. Story Eq. Pl. § 484, *Robinson* v. *Lewis,* Bush. Eq. 58 ; *Williams* v. *Harrell,* 8 Ire. Eq. 123.

BYNUM, J. (After stating the case as above.) The general question is much discussed by the text writers and the decisions, whether a bill of exchange though drawn upon the whole of a specific fund to the credit of the drawer *of itself* can operate as an equitable assignment of the fund, unless the drawee accepts to pay the bill; and a distinction is drawn between a *draft* or *order* so drawn, which all admit does constitute such an assignment, and a bill of exchange which many deny does so operate. Both instruments being negotiable, the distinction in their. effect as applied to the vast dimensions and activity of modern commerce, seems too refined and technical.

We, however, do not enter into that discussion, as our case steers clear of the controversy. The dispute here is not between the holder of the bill and the drawees, but between the holder and the drawer. The rights of the holder against the drawees without or with notice, are out of the question ; therefore much of the discussion at bar is inapplicable. For it is entirely clear to the Court, that even admitting that an ordinary bill of exchange, whether payable generally, or out of a specific fund, does not of itself give the holder a lien upon the funds of the creditor in the hands of his debtor, this bill of exchange in connection with the other facts does show an intention on the part of the drawer to assign the fund to the payees, Kahnweiler & Brothers, or to their order. As between these two parties the question of assignment is one of intention. The intention to assign founded on a sufficient consideration operates as an equitable assignment. The principle is thus stated : " If A, having a debt due him from B, should order it to be paid to C, the order would in equity amount to an as-

signment of the debt, and would be enforced in equity, although the debtor had not assented thereto." Story Eq. Juris. § 1044, and notes; 1 Daniel on Neg. Instr. § 21.

There can be no manner of doubt as to what the parties meant by their agreement in this case. The defendant approaches Daniel Kahnweiler and informs him that he has the sum of $1804,57 to his credit, in the hands of Montel & Bartow in New York, and asks to know if he wishes to purchase exchange on that City. A bill of exchange for the exact amount in the hands of Montel & Bartow is bought and paid for. It does not appear that the defendant ever had another or different sum to his credit on that firm, no other was alluded to, and the transaction was in reference to this specific fund alone. This occurred in the early period of the war between the States, but before commercial intercourse had been legally terminated between them. 91 U. S. R. 7. Apprehending doubtless the confiscation or loss of this sum to his credit in New York, the defendant desired to withdraw it, and hence himself took the initiative to that end. Kahnweiler & Brothers owed a debt of similar amount in New York, and the purchase of the exchange was to the mutual accommodation of the parties. It was, of course, in the contemplation of both that the bill of exchange would at once be remitted to New York in the usual course of business. Nothing else could be done. It does not lie in the mouth of the defendant therefore now to urge that it was *laches* in the payee to remit the bill through the post-office, while war was flagrant. It would have been *laches* to have done otherwise.

On the day the bill was drawn, July the 30th, 1861, it was forwarded to the endorsee in New York through the mail, the regular channel of transmission recognized by commercial usage. It is not necessary to decide whether the deposit of the bill in the post office, addressed to the endorsee whether with or without his consent, was a sufficient

delivery so as to throw the loss on him who should have re-ceived it. That is a question between the endorser and endorsee. The defendant had parted with the title and possession by the delivery of the bill to the payee, and the only concern he has in the question is to know that the action against him is brought in the name of the proper party in interest. He does object that the plaintiff is not that party. This objection is technical only. It does not go to the merits, and when interposed to evade a trial upon the merits, is viewed with disfavor. It presents no difficulty here. When the plaintiff is informed by his endorser of the facts, and of the remittance of the bill, he ratifies the act, does not look to his endorser, but passes him by, makes demand of, and brings his action against the drawer. A ratification of an act has in general the same effect as a previous authority. When therefore the plaintiff thus assented to the act of the endorser in remitting the bill which constituted a lien upon the fund, he became as from the endorsement clothed with the rights of the endorser, and is the proper party to the action.

Assuming that the bill was an equitable assignment of the fund as well to the plaintiff as to his endorser, as against the defendant Anderson who knew the purpose for which the exchange was purchased and is therefore presumed to have assented to the endorsement of the bill as well as to the mode of remittance, the material question is whether the plaintiff has by his *laches* in making demand, lost his lien upon the fund as against the defendant.

The Bill was mailed to the address of the plaintiff the day it was drawn. This was July the 30th, 1861. Civil war was then raging between the States, and some of the greatest battles of the war had been fought. When he sold the bill, the defendant knew the risks, which would attend the remittance to New York, a belligerent State, as well as the party with whom he was dealing. He was anxious to with-

draw his funds from a hostile territory and induced the payee to purchase the exchange.   If it was negligence in the payee to forward the bill by mail at that time, the defendant was contributory to it, and cannot take advantage of it.  A state of war between the country of the maker of a bill, and the holder, is a well recognized excuse for absence of demand for payment.   And this excuse is valid whether commercial intercourse between the  hostile States had been interdicted by law or not, provided intercourse had in fact been obstructed or suspended by existing hostilities.   The Courts take judicial notice of a state of war, and its usual consequences.   These facts irrespective of the acts suspending the operation of the statute of limitations, at least *prima facie*, excused a demand until the restoration of peace, immediately after which he resumed possession of the fund.

· The loss of the bill, the ignorance of the plaintiff of its ever having had an existence, and the obstructions of all the channels of communication between the endorser and the plaintiff, excused a demand upon the drawees.   It would be a great hardship and a perversion of justice, to hold the plaintiff to a loss of his debt, where events over which he had no control, morally and physically prevented his giving notice to, and making a demand of the drawees when the failure to do so has worked no injury to the defendant. · The law does not require impossibilities.   But the drawees did not hold the fund adversely to the plaintiff.   They simply had no notice of his claim and therefore were justified in paying over the fund to the order of the defendant, their principal.

As between the drawer and drawees, without notice, the withdrawal of the fund by the former was rightful.   Was this act wrongful as to the plaintiff and did it of itself give him a cause of action and set the statute in motion ?

We are now in a Court of Equity where we are to determine the nature and effect of this act of resuming the pos-

session of the fund by the defendant in the light of all the facts admitted by the demurrer.

We have before seen that as between the plaintiff and the defendant, the former had an equitable lien upon the fund now in the hands of the latter. The law presumes that this lien and trust subsist and they do subsist until they are terminated by some act showing the unequivocal purpose of the defendant to terminate that relation between the parties. Once a trust always a trust. The Court is therefore slow to put an end to a trust, or allow the parties to do so before the obligations of it are performed. It will, in the interest of justice and fair dealing and to prevent manifest wrong, construe all acts in themselves equivocal, consistently with the contract of the parties, so as to uphold and not destroy the lien. While it is true that the drawees, Montel & Bartow, not having been fixed with notice of the bill drawn upon the fund in their hands, were in no default in paying it over to the defendant, it is yet clear, that had they retained it until the bill, its loss, and the parties to it, had been ascertained as described in the complaint, they would have been after notice amenable to the plaintiff upon the equitable assignment to him.

It is difficult to see how the defendant who is in privity with the drawees can put himself in a better position than they, by repossessing himself of the fund.

To give his act that effect would be to allow him to take advantage of his own wrong. If the bill was originally an equitable assignment of the fund in the hands of Montel & Bartow, it cannot be less so of the same fund in the drawer's hands. It is equally affected still. The drawer cannot by any equivocal act divest himself of the lien impressed upon the *fund* by himself. His act in resuming the fund is easily explained, without imputing to him any purpose to put himself in hostility to his contract in assigning the fund. Indeed by taking the fund out of the hands of his agents,

and into his own, he enabled himself the more effectually
to discharge his liability upon the bill. The fund had re-
mained five years in the hands of his bankers, Montel &
Bartow, uncalled for by the plaintiff. It might never be
called for. Between himself and his bankers he was entitled
to it. His bankers might fail and he be called upon to
make good the loss. His purpose might have been the hon-
est one to see that the fund set apart by him for the pay-
ment of the bill should be applied to that purpose upon the
proper presentation of the plaintiff's claim. When he re-
sumed possession of the fund, he did not avow any claim to
it adverse to the plaintiff, or to the previous assignment he
had made of it. Until the contrary appears the law pre-
sumes that an act in itself, at most equivocal, was done for
an honest, and not a dishonest purpose and in violation of
the precepts of justice and morality. By repossessing the
fund the defendant became in effect, both the drawer and
drawee of it, with the presumption in his favor that he held
it only until a demand by the holder of the bill. This pre-
sumption lasted until the demand was made upon him, to-
wit, May, 1876, when for the first time he claimed adversely
and refused payment. Then and not before was the bill
dishonored, and the plaintiff put to his action.

Prior to that time we think the plaintiff was excused for
non-presentment and non-demand. If an excuse is avoid-
able at all, its benefits must be co-extensive with its subsis-
tence without regard to its duration. It is true that the pe-
riod here was long, perhaps longer than any presented in
the books, but the facts of the case are remarkable and ex-
ceptional, and the mere lapse of time of itself cannot pre-
vent the application of the same reasons constituting "ex-
cuse," to this case, as to all others. We do not see that any
principle of law or rule of equity is violated in holding the
defendant accountable for the money of the plaintiff, which
he has in his pocket and refuses to pay him. The action

having been instituted within three years from the demand, the statute of limitations cannot avail the defendant.

We have expressed our opinion upon a plea of the statute as a bar to the action, because the question has been fully argued as though it was properly before us, and because the parties desired our opinion as necessarily affecting the further prosecution of the action.  For it has been expressly decided by this Court, that under our Code where the statute of limitations is relied on as a defence, it can be taken advantage of only by answer.  The objection cannot be taken by demurrer.  *Green* v. *N. C. R. R. Co.,* 73 N. C. 524.

No citation of authorities has been made in the course of this opinion.  The general principles governing such cases will be found fully discussed in the elementary works upon the subject, by Story, Parsons and Daniel.  See Story on Prom. Notes § § 257, 262; Eq. Jurisprudence § 1044 and Notes; 1 Parsons on Notes and Bills 461, 332 and ch. 11; 1 Daniel on Neg. Instr. § § 21, 22.  2 Daniel § § 1173, 1181; *Row* v. *Dawson,* 3 T. and W. Leading Cases in Eq. 212; and the exhaustive notes thereto.  Also *Maundeville* v. *Welsh,* 5 Wheat. 286; *Tieman* v. *Jackson,* 5 Pet. 580; *Winter* v. *Drury,* 5 N. Y. 525; *Harris* v. *Clark,* 3 N. Y. 115; *Harrison* v. *Williamson,* 2 Edw. ch. 438; *Cowperthwaite* v. *Sheffield,* 3 Comst. 243; *Bank of Commerce* v. *Bogy,* 44 Mo.; *Windham Bank* v. *Norton,* 22 Conn. 213.

SMITH, C. J. *Dissenting.*  While I concur in the disposition made by the Court of this cause, on the authority of *Green* v. *N. C. R. R. Co.,* 73 N. C. 524, I think the plaintiff's action is barred by the statute of limitations.

When the defendant withdrew and appropriated to his own use the fund which by his draft he had assigned to the plaintiff, he violated an implied contract that the money should remain to meet the draft, and became instantly liable to an action.

Nor was the operation of the statute suspended until he knew of the defendant's receiving and misapplying the money, as under the former practice his remedy would have been an action at law, and not exclusively if at all cognizable in a Court of Equity. C. C. P. § 34 (9). *Blount* v. *Parker, ante,* 128.

RODMAN, J. *Dissenting.* I concur in the opinion of the Court in every respect, except that I think the statute of limitations bars the plaintiff's recovery. When defendant received the money from Montel & Bartow, he took what was the property of the plaintiff, and the statute began to run from that time. It is immaterial that it had become the property of the plaintiff by an assignment, which would be recognized as an assignment only in a Court of Equity. It passed a legal estate and did not create a trust.

The defendant took the property tortiously, as between him and the plaintiff, and held it adversely, as any other trespasser or disseizor does. He did not take it as agent or trustee for the plaintiff. If *he* did, every other man who takes another's property without his knowledge, takes it as his agent or trustee.

In *Blount* v. *Parker, ante,* 128, it is held that the fact that the owner of the property was ignorant of the trespass, will not prevent the statute from running. The statute of limitations is based upon the opinion that it is better that a just right shall sometimes be lost, than that claims shall be made after the times fixed by the statute, which defendants may be unable to disprove, however false. They are statutes of repose.

PER CURIAM.                    Judgment affirmed.