Scofield, J.,
delivered the opinion of the court:
The Chesapeake and Ohio Eailroad Company, the claimant, carried the United States mail from 1859 to June 1, 1861. The service was all within the State of Virginia. There was no express contract, but the company was allowed and paid down to January 1, 1861, at the rate of $21,408.33 a year.
In this suit the claimant seeks to recover' compensation at that rate from January 1, 1861, to June 1,1861.
The case - comes to this court by transmission by the Postmaster-General under section 1063 of the Eevised Statutes.
We will first consider the claimant’s right to recover under the provision of the Act of March 3, 1877 (19 Stat. L., 362). That act is as follows:
*65 “ That the sum of $375,000, or so much thereof as may be necessary, be appropriated to pay the amount due to mail contractors for mail service performed in the State of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, Kortli Carolina, South Carolina, Texas, Tennessee, Virginia, and West Virginia in the years 1859,1860,1861, and before said States respectively engaged in war against the United States; and the provisions of 3480 of the Revised Statutes of the United States shall not be applicable to the payments therein authorized: Provided, That any such claims which have been paid by the Confederate States government shall not be again paid.”
In order that the claims embraced in this appropriation might be paid pro rata in case it should be found insufficient to cover them all, the Secretary of the Treasury directed that none should be paid until all should be received and adjusted. In consequence of this order no claims were paid within two years. The whole appropriation, as the law requires, was therefore returned to and covered into the Treasury.
This court has repeatedly held "that the rights of parties provided for in this appropriation were not lost by its return to the Treasury, but remained subsisting rights, which the court had jurisdiction to enforce. (Hukill’s Case, 16 C. Cls. R., 562; Huffman’s Case, 17 id., 55; George’s Case, 18 id., 432.)
HukilPs Case also decided that the legislation of the Confederate States in favor of these claimants (finding iv) created a presumption that carriers of the mail within the insurrection-ary States were paid by that government, which presumption the claimants were bound in some measure to rebut.
The facts tending to overthrow the presumption of payment in this case are set forth in finding iv. From these facts the court has found that the claim presented was not paid by the Confederate government.
The court therefore holds that the claimant is entitled to recover for services rendered subsequent to December 31, 1860, and prior to the time when “Virginia engaged in war against the United States.”
At what time Virginia “engaged in war against the United States” is more a question of fact and history than of law.
In January, 1861, the legislature passed an act providing for the assembling of a convention to consider the question of secession. The convention assembled February 13,1861, and on April 17, 1861, passed thfe ordinance of secession, with this pro *66 vision: “This ordinance shall take effect and be an act as of this day when ratified by a majority of the votes of the people of this State cast at a poll to be taken on the fourth Thursday in May.” It was ratified on that day. April 16,1861, the governor of the State refused to furnish its quota of volunteers called for by the President, and concluded his letter of refusal as follows: “You have chosen to inaugurate civil war, and having done so we will meet it in a spirit as determined as the Administration has exhibited toward the South.” April 17, 1861, the convention passed an ordinance requiring the governor to “call out as many volunteers as might be necessary to repel invasion and protect citizens of the State.” In pursuance thereof the governor, on April 17, 1861, did issue a proclamation reciting the supposed grievances against the United States, and ordering “all volunteer regiments and companies to hold themselves in readiness for immediate orders, and to report at once to the adjutant-general their organization and numbers, and prepare themselves for efficient service.” On the same day the State authorities took possession of the custom-house at Eichmond, and soon after of the navy-yard at Norfolk and the arsenal at Harper’s Ferry. April 24, 1861, the convention placed the military forces of the State under the control of the president of the Confederacy, and on the next day adopted the provisional constitution of the Confederate States. By the subsequent ratification of the ordinance all these preparations for and declarations and acts of war and seizures of United States property were also ratified.
From thesefacts thecourtisof theopinion that Virginia should be held to have “ engaged in war against the United States” April 17, 1861.
The amount earned by services in carrying the mail prior to April 17, 1861, and subsequent to December 31, 1860, over and above payments and proper deductions, as appears in finding ii, is $4,622.85.
The court further holds that the claim for services rendered after April 17,1861, is not properly before us. At that time the claimant became, in contemplation of law, an alien enemy, and as such the government may prescribe limitations and conditions within and under which it must be dealt with by the executive officers. (Prize Cases, 2 Black, 666; Alexander’s Cotton, 2 Wall., 404; United States v. Insurance Co., 22 Wall., *67 104; Willison v. Peterson, 7 Taunton, 439; Matthews v. McStea, 91 U. S. R., 7.)
The case last cited (Matthews v. McStea), at first supposed to support the claimant’s position, will be found, upon a careful examination of the several principles therein announced and decided, to rule strongly against it.
The question involved in the case was whether a partnership, some of whose members resided in Louisiana and some in New' York, was dissolved by the war prior to April 23, 1861, so as to render void partnership transactions of that date. The court said :
“ It must be conceded, as a general rule, to be one of the immediate consequences of a declaration of war, and of the effect of a state of war even %ohen not declared, that all commercial intercourse and dealings between the subjects or adherents of the contending powers is unlawful and interdicted.”
And the court said:
“ That the civil war (the war of the rebellion) had an existence commencing before that date (April 23,1861) must be accepted as an established fact.”
The logical and necessary Sequence of these positions is that commercial intercourse was unlawful and interdicted from the beginning of the war, which beginning was prior to April 23, 1861. Had there been no subsequent action by Congress affecting the question, the court must necessarily have held that the partnership was dissolved prior to April 23, 1861.
Congress, however, July 13, 1861, authorized the President “ to declare that the inhabitants of such State * * * are in a state of insurrection, and thereupon commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United States, shall cease and' be unlawful.” The President issued the proclamation August 16,1861. The effect of this law in postponing and determining the time when commercial intercourse should become unlawful is thus stated by the coúrt:
“ The enactment that it (commercial intercourse) should not be permitted after a day then in the future must be considered an implied affirmation that up to that day it was lawful; and certainly Congress had the power to relax any of the ordinary rules of war,”
In the case at bar there has also been an interference by acts of Congress, but in their effect quite in an opposite direction.
*68 The Act of March 2, 1867 (14 Stat. L., p. 571), re-enacted in the Revised Statutes as section 3480, provides as follows :
" Sec. 3480. It shall be unlawful for any officer to pay any account, claim, or demand against the United States which accrued or existed prior to the thirteenth day of April, eighteen hundred and sixty-one, in favor of any person who promoted, encouraged, or in any manner sustained the late rebellion, or in favor of any person who during such rebellion was not known to be opposed thereto, and distinctly in favor of its suppression; and no pardon heretofore granted, or hereafter to be granted, shall authorize the payment of such account, claim, or demand, until this section is modified or repealed. But such section shall not be construed to prohibit the payment of claims founded upon contracts made by any of the departments, where such claims were assigned or contracted to be assigned prior to the first day of April, eighteen hundred and sixty-one, to the creditors of such contractors, loyal citizens of loyal States, in payment of debts incurred prior to the first day of March, eighteen hundred and sixty-one.”
It cannot be supposed that Congress would prohibit government officers from paying claims existing prior to the beginning of the war in favor of citizens who were loyal when the claim accrued, although they subsequently became involved in the. rebellion, and still leave such officers at liberty to pay claims which originated after the war began. This enactment must be considered an implied affirmation that the war began when Fort Sumter was fired upon, April 12, 1861, and that the payment of all claims originating after that date was prohibited by the rules of war.
Again, the Act of March 3,1877, above cited, authorizes the payment of “ amounts due to mail contractors for services performed in the Confederate States before said States respectively engaged in war against the United States.” Is not a prohibition to pay claims originating after that time clearly implied ? Congress prohibited the payment of the one because it was not prohibited by the laws of war, and omitted to prohibit the payment of the other because it was already prohibited by the laws of war.
It is contended that a corporation is not subject to this law of nations. To this we do not assent. A corporation controlled by the enemy, located and operated entirely within his jurisdiction, and constantly employed in carrying on the war must be regarded, so far as its contracting power is concerned, as a *69 person who “ promoted, encouraged, and sustained the rebellion.”
Whether such a claim by such a claimant is declared void by the statute, not in express terms, but by necessary implication, we do not now decide.
Much can be said on each side of that question, and if the claimant had brought its action within six years that question would have been before us now.
But it is plain, we think, that the Postmaster-General was prohibited from paying it, and hence was prohibited from transmitting it to this court, which is a process toward obtaining payment. (Hart’s Case, 15 C. Cls. R., 414; Green’s Case, 18 id., 93; McClure’s Case, 19 id., 30.) It follows that in this action the court has no jurisdiction of any claim except such as the Postmaster-General might lawfully transmit, and the only claim which he could transmit was a claim founded on the act 1877 and subject to the limitations of that statute, one of which was that the cause of action should be only for services rendered before the State of Virginia engaged in war. To that extent we have jurisdiction, and can adjudicate the case upon its merits. As to any subsequent cause of action, we must hold that it is not properly before the court.
It is objected by the defendants that the claim is barred by the statute of limitations. So far as that portion of the claim which is covered by the act of March 3, 1877, is concerned, we do not concur in the objection. The claim was presented to the Post-Office Department soon after the passage of that appropriation, and was pending there until September 25, 1884, when it was transmitted to this court. In Lippitt’s Case (100 U. S. B., 663) the Supreme Court decided that this court can take jurisdiction of a claim more than six years old when it was presented to the department within the six years, although transmitted to the court after six years had elapsed. This court has decided several cases in accordance with this rule. (Winnisimet Case, 12 C. Cls. R., 319; Lippitt’s Case, 14 id., 148; Green’s Case, 18 id., 93.) For the portion of the claim extending from April 17 to June 1,1861, no demand appears to have been made in the department until 1874, more than six years after it accrued. Whether that 'fact would deprive this court of jurisdiction need not now be considered, inasmuch as it is deprived of jurisdiction for the minon above stated.
*70 Judgment will be entered in favor of the claimant for the sum which appears to be due for services rendered prior to April 17, 1861, amounting to $4,622.85.
Draiie, Ch. J., sat in this case, but took no part in the decision.