Weight, J.,
delivered the opinion of the court:
Plaintiff is a corporation organized under the laws of Great Britain and is a subject of that Kingdom, and was, during the war between Spain and the United States, and the latter Government with the Filipinos, engaged as a general commission mercantile trading house in the port of Manila and other ports in the Philippine Islands, and as a part of its business imported goods of various kinds from the United States, the growth, produce, or manufacture of the several States of the Union. As a result of the war with Spain the port of Manila passed to the control of the military authority of the United States, and by the exchange of ratifications of the treaty by the two Governments concerned, April 11, 1899, the sovereignty possessed by the *27 Kingdom of Spain in the Philippine Islands was transferred to and accepted by the United States.
Previous to, at the time of, and after the treaty of peace there existed in the said islands an organized, armed insurrection against the laAvful authorities therein, and on the 4th day of February, 1899, the organized military forces of the Filipinos, headed by Aguinaldo, began war against the United States forces in the Philippine Islands, which continued until July 4, 1902. At the time the war began the organized military force 'of the Filipinos was between 50,000 and 60,000, which force was kept recruited more or less effectively during the period of the Avar, and during the same period of time the United States had called into action troops to the total number of 126,468 to operate against the insurgent forces. During this Avar the total number of engagements Avas 2,144. The number of deaths from all causes among the troops of the United States during the Avar was 4,314, and 3,022 were wounded in action.
During the war with Spain the military authorities of the United States imposed certain tariff duties and taxes upon importations into the ports of the Philippine Islands in possession of such military authorities, and ordered the same to be levied and collected as a military contribution, which Avas accordingly done, and these levies and collections Avere by the same authority continued throughout the Avar with the Filipinos, until Congress, bjr appropriate legislation, substituted their Avill for that of the military government. The reArenues thus derived went into the custody of the military commander, and were applied by him toward paying the expenses of the then existing military government, and in the prosecution of the war against the insurgents. None of the revenues so levied and collected were ever paid into the Treasury of the United States, nor were they subject to the jurisdiction or order of any officer of the Treasury Department.
By this suit plaintiff seeks to recover of the defendant so much of the tariff duties as were levied and collected from it betwen the date of signing the treaty of peace between Spain and the United States and the exchange of ratifica *28 tions thereof April 11,1899, and for all so collected after the latter date until November 15, 1901.
Certain preliminary questions have been made by the defense herein, such as (1) the plaintiff’s incapacity to sue in this court by reason of alienage to Great Britain in consequence of its corporate existence instead of being a natural person; and (2) the action is one sounding' in tort, and of which we have no jurisdiction.
In respect to the first objection we are satisfied to determine it against .the Government’s contention on the principle as frequently held, that for the purposes of jurisdiction a corporation is a citizen of the State in which its corporate capacity was endowed with existence, and by extending this qualification to the plaintiff we perceive no reason why it should not 'be regarded as a citizen or subject of Great Britain, thus enabling it to maintain this suit in view of the comitj’- existing between the Governments of the United States and Great Britain.
In respect to the second objection before noted, we think the decision in Dooley v. United States (182 U. S., 222) disposes of it favorably to the jurisdiction of this court.
We are now brought to consider the important question in issue upon which our judgment is invited, namely, whether exaction of the tariffs on importations by the plaintiff from the United States into the port of Manila, which were levied and collected by the military authorities, can be sustained. If such exaction was in a time of peace in the Philippine Islands, when the civil law prevailed, or could be enforced by the civil authorities, and after the exchange of ratifications of the treaty of peace between the United States and Spain, it is not denied that under the authority of the Insular eases, so called, the collection was illegal for the reason that the United States was not a foreign country with respect to said islands within the meaning of the tariff’ laws of the United States.
The case then clears itself to the single question: If a State of war existed in the Philippine Islands did that ipso facto justify the exaction of the tariffs that were collected? That such war did exist before and after the exchange of *29 ratifications of the treaty with an armed military power in said islands is beyond dispute, and whether such war was declared or recognized in a particular manner or not it seems to us is but to beg the question. All men must be held to intellectual honesty to see and know the things that are plainly given them to see and know. We have already shown that an organized armed military force of over 50,000 men was opposed to and contesting with the United States the right of sovereignty in said islands, the treaty with Spain to the contrary notwithstanding. To overcome this armed force the United States employed 126,468 of its mili-tray forces in 2,744 separate engagements;' lost 4,374 of its soldiers by death from all causes, and 3,022 were wounded in action. Important belligerent rights were conceded to the insurgent forces, and the laws of war were applied to intercourse between them and the United States military forces. Their soldiers, when captured, were treated as prisoners of war, and not held for treason; and, generally, all things were done as if the war had been a public one with a foreign nation. If these facts do not prove the existence of a state of war, then they are futile for every purpose. Moreover, a sufficient statement for this purpose is that the President and the Congress did once and again recognize a condition of war in the archipelago, and applied to it the usual measures incident to the treatment of a public war, and did thus invoke all the military power and aixthority vested in the Government in the prosecution of such war.
A war thus, recognized, and-prosecuted ought forever to set at rest the fact of its existence, and the acts of the legislative and executive authorities in that respect,- subject to judicial notice, should be equally as binding upon the judicial department of the Government as upon the legislative and executive. Any decision to the contrary would have no effect except in the case in which it might be made, because the fact could not be so changed, and will exist in history as a fact for all future time.
The question of war is one to be determined by the political department of the Government. The Protector (12 Wall., 700), where the court, among other things, said: “Acts of hostility by the insurgents occurred at periods so *30 various and of such different degrees of importance and in parts of the country so remote from each other, both at the commencement and the close of the civil war, that it would be difficult, if not impossible, to say on what precise day it began or terminated. It is necessary, therefore, to refer to some public act of the political departments of the Government to fix the dates; and, for obvious reasons, those of the executive department which may be and, in fact, was, at the commencement of the hostilities, obliged to act during the recess of Congress, must be taken.” (Williams v. Suffolk Ins. Co., 13 Pet., 415, 420; cited in Thomas v. U. S., 39 C. Cls. P., 1.)
At the time the ratifications of the treaty of peace were exchanged the treaty had thereafter the force of law, but b}r reason of the war existing in the islands at the time it failed to become effective, and it, as well as all other merely civil law, was suspended and superseded 'by military law until such time as it might be possible to put the treaty and civil law in force and establish proper administrative and judicial authorities to administer and enforce the same. The vital point is that until the military forces of the United States had suppressed armed resistance against its authority and established its sovereignty in the islands the Government could not give the effect to the treaty' contemplated by the high contracting parties. The case of Dooley, supra, and other Insular cases are not inconsistent with this view.
If the court had in mind the facts disclosed by this record, it could hardly have made a more pertinent exception than it did in the Dooley ease, where it was said: “His (military commander’s) power to administer would be absolute, but his power to legislate would not be without certain restrictions; in other words, they would not extend beyond the necessities of the case.” No war, in fact, existed in Porto Pico, into which the importation had been made forming the subject of the Dooley case, nor had war existed there at any time. While the government there was for the time being-in the military commander from the necessities of the case, yet he was not called upon to exercise the military authority incident to a state of war, nor did the necessities of the case demand the exercise of such power.
*31 In time of war, within the military district of its operation, no restrictions are placed upon the power and authority of the military commander except such as are imposed by the common consent of all civilized people. His power is absolute within the radius of his jurisdiction. He may jjrohibit or restrict all trade or commerce within his lines. As a condition to commerce within his military district he may ' impose contribution to assist in the expenses of the war or in giving such care to indigent noncombatants as humanity may require. These principles are, it seems to us, elementary and have their existence in long-established and universal usage. They pervade the pages of history. Authorities are unnecessary to prove their existence, but recognition has been given them in Matthews v. McStea (91 U. S., 9); Prize cases (2 Black., 635); Hamilton v. Dillin (21 Wall., 73).
The tariffs paid by the plaintiff were not levied or collected bjr virtue of the general statutes of the United States relative to customs, nor by authority of any general law, nor in the exercise of the civil powers of the Government, the latter never having been in force in consequence of the prevailing war throughout said islands; but such tariffs were collected solely as a military contribution, exacted by the military government, and as a condition annexed to the privilege of importing goods upon which the duties were levied, and this is distinguishable from Diamond Rings (183 U. S., 176), where the question was as to the enforcement of the statute at Chicago, Ill., against property taken there from Luzon.
So far as appears from the evidence, the privilege of sailing away with its goods was not prohibited to the plaintiff, and while it does appear it was prohibited from landing the goods without first making payment of the duties, this does not deprive such payment of the nature of being-voluntary. Plaintiff knew, or must be held as knowing, the military conditions that existed at the port to which it had sailed, and doubtless it made the importation in the expectation of having to pay the duties that were paid by it. The money was not covered into the Treasury of the United States, but was applied by the military government *32 toward its own expenses in prosecuting the war against the enemies of the United States, and, so far as appears, the plaintiff acquiesced both in the payment and such use of the money.
We have expressed no opinion concerning the effect of the ratification by Congress, so much discussed on the trial, of the acts of the Commander in Chief, deeming the question immaterial to the issue involved. In time of war the Commander in Chief has the same powers as other civilized governments, and the exercise of them needed no ratification to give to them effective force.
Congress, however, by the act approved July 1, 1902 (32 Stat. L., 691), did provide as follows:
“ Sec. 2. That the action of the President of the United States heretofore taken by virtue of the authority vested in him as Commander in Chief of the Army and biavy, as set forth in his order of July twelfth, eighteen hundred and ninety-eight, whereby a tariff of duties and taxes as set forth bjr said order was to be levied and collected at all ports and places in the Philippine Islands upon passing into the occupation and possession of the forces of the United States, together with the subsequent amendments of said order, are hereby approved, ratified, and confirmed, and the actions of the authorities of the government of the Philippine Islands, taken in accordance with the provisions of said order and subsequent amendments, are hereby approved: Provided, That nothing contained in this section shall be held to amend or repeal an act entitled ‘An act temporarily to' provide revenue for the Philippine Islands and for other purposes,’ approved March eighth, nineteen hundred and two.
“ Sec. 3. That the President of the United States, during such time as and whenever the soA^ereignty and authority of the United States encounter armed resistance in the Philippine Islands, until othenvise provided by Congress, shall continue to regulate and control commercial intercourse with and within said islands by such general rules and regulations as he, in his discretion, maj’- deem most conducive to the public interests and the general welfare.”
.It follows, from the vieAvs we have expressed, that in oxir opinion the petition should be dismissed, and the judgment of the court is that it be done accordingly.
Nott, Ch. J., and Howry, J., did not sit, and took no part in the decision of the case.