BOSTON PENNY SAVINGS BANK *vs.* STONEHOLM CO., INC., & others.

Suffolk.    January 4, 1949. — February 4, 1949.

Present: QUA, C.J., LUMMUS, WILKINS, SPALDING, & WILLIAMS, JJ.

*Contract*, Construction. *War*. *Words*, "Cessation of hostilities."

The words "cessation of hostilities" in a contract, made in 1944, providing for a reduction in the rate of interest payable under a mortgage note given in the purchase of a large garage, and for elimination of principal payments thereunder, "until six months after the cessation of hostilities with Germany and Japan," were used in their ordinary rather than in their technical sense and properly were ruled to mean the formal surrender of Japan on September 2, 1945, and not the cessation of hostilities proclaimed by the President of the United States effective on December 31, 1946.

BILL IN EQUITY, filed in the Superior Court on March 22, 1946, for a declaratory decree.

The case was heard by *Cahill*, J.

In this court the case was submitted on briefs.

*S. Bergson*, for the defendant Stoneholm Co., Inc.

*S. Maylor*, for the plaintiff.

SPALDING, J.  On July 29, 1944, the plaintiff conveyed a parcel of real estate in Boston, on which there was a two hundred fifty car garage, to the defendant Moses. At the time of the conveyance Moses gave to the plaintiff, as part of the purchase price, her note in the sum of $122,500, and a mortgage of the property as security therefor. The note was to be paid "in or within" ten years from date and bore

interest at the rate of three per cent per annum. Monthly payments of principal at the rate of three per cent per annum, or $306.25, were also called for. By a written agreement entered into between the parties on the same day it was agreed that the interest on the note would be at the rate of two per cent per annum "until six months after the cessation of hostilities with Germany and Japan," and it was further agreed that no monthly payments of principal would be required prior to that time. On October 31, 1945, the property was conveyed to Stoneholm Co., Inc. (hereinafter called the defendant), which assumed the mortgage. The plaintiff concedes that the defendant is entitled to the benefits of the collateral agreement mentioned above. It appeared from copies of the official surrender documents which were introduced in evidence that the formal surrender of Germany took place on May 8, 1945, and that of Japan on September 2, 1945.

A controversy having arisen between the parties as to when "the cessation of hostilities with Germany and Japan" occurred within the meaning of those words in the agreement, the plaintiff brought these proceedings for declaratory relief. See G. L. (Ter. Ed.) c. 231A, as inserted by St. 1945, c. 582, § 1. The facts are not in dispute. The judge, after finding the facts as above stated, ruled that the expression "cessation of hostilities with Germany and Japan" in the agreement "means at such time as Germany and Japan shall have formally surrendered," and that the payments of interest at the increased rate of three per cent and the monthly payments of principal were to commence six months after September 2, 1945. From a decree entered in accordance with that ruling, the defendant appealed. The evidence is reported.

The decree was right.

The defendant conceded that the expression "cessation of hostilities" in the agreement does not mean the ending of the technical state of war that exists during the period between the surrender on the field of battle and the formal termination of the war by treaty or otherwise. See *Hijo* v. *United States*, 194 U. S. 315, 323; *Hamilton* v. *Kentucky*

*Distilleries & Warehouse Co.* 251 U. S. 146, 165; *Ludecke* v. *Watkins,* 335 U. S. 160, 168–169. The defendant's position is that there was no cessation of hostilities until it was proclaimed by the President of the United States on December 31, 1946. From evidence introduced in the hearing below the circumstances which gave rise to this proclamation were these: On September 6, 1945, four days after the Japanese surrender, the President of the United States in a message to the Congress discussed the problems of reconversion from war to peace. He directed attention to the fact that certain war time statutes would "continue to be effective until a formal state of peace has been restored, or until some earlier termination date is made applicable by appropriate governmental action." He went on to point out that another group of statutes which by their own terms would terminate "upon the cessation of hostilities" or "upon termination of the war" would "in fact and in law terminate only by a formal proclamation to that effect by the President or by appropriate congressional action. . . ." But he continued, "The time has *not* yet arrived, however, for the proclamation of the cessation of hostilities, much less the termination of the war. Needless to say, such proclamations will be made as soon as circumstances permit." [1]

On December 31, 1946, the President issued a proclamation in which he stated that although a state of war still existed it was now possible and in the public interest to declare that hostilities had terminated. Accordingly he proclaimed "the cessation of hostilities of World War II, effective at twelve o'clock noon, December 31, 1946." 12 Fed. Reg. 1. Obviously, the purpose of the proclamation, which set an arbitrarily selected date, was to fix a definite termination date for numerous war time statutes. See *Arroyo* v. *Puerto Rico Transportation Authority,* 164 Fed. (2d) 748 (C. C. A. 1); 47 Col. L. Rev. 255, 261. It has no relevancy here.

If the question involved here depended on whether a state

---

[1] See House Document No. 282, 79th Congress, 1st Session, page 9. See also in the same document letter of the Attorney General to the President (pages 49–50) and the compilation of the various war time statutes annexed thereto.

of war in the technical sense had commenced or ended, we would be required to look to, and would be bound by, a determination of that question by one of the political departments of the government. *United States* v. *Anderson,* 9 Wall. 56, 70. *The Protector,* 12 Wall. 700, 702. *Matthews* v. *McStea,* 91 U. S. 7, 9. *New York Life Ins. Co.* v. *Durham,* 166 Fed. (2d) 874, 875 (C. C. A. 10). *Palmer* v. *Pokorny,* 217 Mich. 284. That principle is not applicable here. The language used in the agreement did not refer to the sort of event, the happening of which could be determined only by a political branch of the government. But however that may be, we are of opinion that the parties in making the agreement here were using the words "cessation of hostilities" in their ordinary rather than in their technical sense. The circumstances attending the execution of the agreement confirm this conclusion. The property for which the mortgage was given was a large garage which the plaintiff had acquired by foreclosure. The sale to Moses, from whom the defendant later acquired it, took place in the midst of a global war. It is common knowledge that during the war the rationing of tires and gasoline, the lack of new automobiles, and the fact that millions were in our armed forces, resulted in a substantial reduction in the use of automobiles. It was hardly an auspicious time in which to acquire a large garage. The parties, of course, knew this, and it was unquestionably for that reason that they provided for a lower rate of interest and a suspension of the payments on principal until six months after the cessation of hostilities. They doubtless contemplated that automobiles would then be back on the roads to an extent sufficient to justify increased payments on the note. The time that they had in mind was a date six months after the shooting was over rather than after some indefinite later date to be arbitrarily determined by some official political pronouncement.

Support for this conclusion may be found in several recent cases. *Colonial Hotels, Inc.* v. *Maynard,* 158 Fla. 318. *Rupp Hotel Operating Co.* v. *Donn,* 158 Fla. 541, 548. *Glantz* v. *Willow Supply Co.* 139 N. J. Eq. 523, 525–526. *Michael Tuch Foundation, Inc.* v. *C. Hazelcorn, Inc.* 187 Misc. (N. Y.)

954, affirmed 188 Misc. (N. Y.) 1046, appeal denied 272 App. Div. (N. Y.) 917. *Samuels* v. *United Seamen's Service, Inc.* 165 Fed. (2d) 409 (C. C. A. 9). The facts in the case last cited closely resemble those in the case at bar. There the plaintiff leased certain premises to the defendant, a nonprofit corporation, which was engaged in providing lodging and places of recreation for merchant seamen. The lease provided that it was to "*extend for a period of six months from and after the cessation of hostilities in the present war with Japan*" (emphasis supplied). Proceedings for declaratory relief were brought to determine the meaning of this clause. The plaintiff contended that it meant six months after August 14, 1945 (when the "cease fire" order was given), and the defendant contended that it meant six months after the President's proclamation of December 31, 1946. The court rejected the latter contention, holding that the words used by the parties must be given their ordinary meaning and that the lease came to an end six months after August 14, 1945, the date when actual hostilities with Japan ceased.

The court in the *Samuels* case, as we do here, interpreted the words under consideration in the light of the circumstances in which the contract was made. It is not inconceivable that in other circumstances these words might have a different meaning. See note, 168 A. L. R. 173. We are not called upon to decide whether within the meaning of the agreement hostilities came to an end on August 14, 1945, rather than on September 2 (as the decree states) when the formal Japanese surrender took place. The plaintiff has not appealed from the decree (see *Coe* v. *Coe*, 313 Mass. 232, 234) and it has conceded in open court that hostilities did not cease prior to September 2, 1945.

*Decree affirmed with costs.*